Filed 7/6/21  Hillair Capital Investments v. West CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| HILLAIR CAPITAL INVESTMENTS LP et al., | B299897 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC614374) |
| v. | |
| KIM KARDASHIAN WEST et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Richard L. Fruin, Jr., Judge.  Affirmed.

Fayer Gipson, Gregory A. Fayer, Elliot B. Gipson and Michelle K. Millard for Plaintiffs and Appellants.

Kinsella Weitzman Iser Kump & Aldisert, Michael J. Kump, Jonathan P. Steinsapir and Nicholas C. Soltman for Defendants and Respondents.

———————————————

This case arises primarily out of disputes over licensing royalties, indemnity obligations, and promotional duties between the owners and affiliates of a cosmetics company and Kim Kardashian West, Kourtney Kardashian, Khloe Kardashian, Kimsaprincess Inc., 2Die4Kourt, and Khlomoney Inc. (collectively the Kardashians).[1]

The cosmetics company was originally operated by Boldface Licensing + Branding (Boldface) pursuant to a licensing agreement (Licensing Agreement) with the Kardashians. Boldface developed a cosmetics line with the brand name Khroma Beauty but later rebranded it as Kardashian Beauty. Haven Beauty, Inc. (Haven), a company affiliated with Hillair Capital Investments LP (HCI) and Hillair Capital Management LLC (HCM) (collectively appellants), eventually acquired all of Boldface's assets from a receiver, including its rights under the Licensing Agreement.

Though Haven attempted to continue the cosmetics line, the relationship between appellants and the Kardashians soon degraded. HCI and HCM sued the Kardashians for, inter alia, breaching their obligations to promote the cosmetics line. The Kardashians, in turn, initiated arbitration pursuant to arbitration clauses in two agreements, the Licensing Agreement and the mutual releases (Releases) signed by the parties just prior to the time Haven acquired Boldface's assets. In their

---

[1]     Kimsaprincess Inc., 2Die4Kourt and Khlomoney Inc. are loan out companies for, respectively, Kim Kardashian West, Kourtney Kardashian, and Khloe Kardashian. For ease of reference, we equate the three companies with the corresponding individuals.

2

demand for arbitration, the Kardashians asserted claims against appellants for Haven's failure to pay royalties. Additionally, they asserted a claim for indemnity based on Haven's failure to pay the attorney fees associated with prior litigation in which the Kardashians were sued for trademark infringement over Boldface's use of the brand name Khroma. The trial court compelled HCI and HCM to arbitrate their claims against the Kardashians, and the arbitration panel (Panel)[2] determined that it had jurisdiction over certain claims asserted by the parties against each other. The Panel awarded the Kardashians over $11 million against appellants for, among other things, Haven's failure to pay royalties and indemnity. The trial court confirmed the arbitration award, and it denied appellants' contemporaneous petition for vacatur.

On appeal, appellants seek review of the orders compelling arbitration, confirming the arbitration award, and denying appellants' petition for vacatur.

We affirm the judgment.

FACTS[3]

**The Licensing Agreement Between Boldface and the Kardashians**

In 2012, the Kardashians and Boldface executed the Licensing Agreement to allow Boldface to use the Kardashians'

---

[2]    The Panel was comprised of three arbitrators.

[3]    We have incorporated the Panel's factual findings into our statement of facts. The appellate record does not contain a transcript from the arbitration, and the Panel's factual findings are not subject to review for sufficiency of the evidence. (*Advanced Micro Devices, Inc. v. Intel Corp.* (1994) 9 Cal.4th 362, 367, fn. 1. (*AMD*).)

trademarks, images, and likenesses for the development, manufacture, production, distribution, advertisement, promotion and sale of specified cosmetic products.  The Kardashians were entitled to an advance of $1 million plus an 8 to 10 percent royalty on the wholesale price of products (sales royalty) or, alternatively, guaranteed minimum royalty payments for various contract periods and an optional renewal period for a total of $5,206,900.[4]  They agreed to provide ancillary services, which included making marketing and production appearances, taking photographs for promotional material and product packaging, wearing products, and providing design input.

Boldface agreed to defend, indemnify and hold each of the Kardashians harmless from and against claims by third parties based on the development, manufacture, distribution, and sale of its products.

The Licensing Agreement contained an arbitration clause providing that all "claims, disputes and other matters arising out of or relating to this Agreement shall be submitted to, and determined by, binding arbitration in accordance with Judicial Arbitration and Mediation Services [(JAMS)] . . . and . . . in accordance with its Commercial Rules[.]"

**HCI and HCM**

HCM "manages the investment funds of[,] and is the investment advisor to[,]" HCI.  HCI invests in small-cap publicly-traded companies and in other business opportunities.  HCM and

---

[4]     Contract period one was from May 9, 2012, to November 30, 2013; contract period two was from December 1, 2013, through November 30, 2014; contract period three was from December 1, 2014, through November 30, 2015; contract period four was from December 1, 2015, through November 30, 2016; and the renewal period was 18 months.

HCI act primarily through Sean McAvoy (McAvoy) and Neal Kaufman (Kaufman).

**Trademark Infringement Litigation; HCI's Loan to Boldface; the Kardashians' Forbearance**

Boldface publicly announced that its new line of cosmetic products would be called Khroma Beauty. At the time, Lee Tillett, Inc. held a federally registered "Kroma" mark used in connection with the sale of its own cosmetics products. In October 2012, Lee Tillett, Inc. sued Boldface and the Kardashians for trademark infringement in Florida, and Boldface later filed a competing declaratory relief action in California (collectively the *Tillett* litigation).

Boldface borrowed money from HCI to fund the litigation as well as its cosmetics operation, and it released cosmetic products under the new brand name Kardashian Beauty. Due to the money they invested in Boldface, HCI and/or HCM had the leverage to select John LaBonty (LaBonty) to serve as Boldface's new chief executive officer (CEO).

To assist Boldface in coping with its financial distress and the demands of the *Tillett* litigation, the Kardashians agreed to forbear payment of sales royalties and guaranteed minimum royalties due throughout 2013 and 2014. The *Tillett* litigation settled and a judgment was entered against Boldface and the Kardashians.

**The July 31, 2014, Term Sheet**

By July 2014, Boldface was descending into insolvency. HCI and/or HCM discussed a cooperative relationship with the Kardashians to keep Kardashian Beauty afloat. On July 31, 2014, HCM and the Kardashians executed a term sheet (Term Sheet) identifying them as investors in a company called Newco

Beauty Company (Newco).  Per the Term Sheet, HCI would acquire Boldface's assets in an insolvency proceeding with a $2 million credit bid.  Also, HCI would invest equity and pay the judgment in the *Tillett* litigation.  While HCI would own 51 percent of Newco, the Kardashians would own 40 percent and unrelated parties would own 9 percent.  The Term Sheet set forth various conditions, including:  "[Newco] shall have obtained free and clear title to the Licens[ing] Agreement;" and it "shall have been amended by [the Kardashians] and [Newco] to provide for the elimination of minimum required payments[.]"

The parties negotiated for several months but they did not agree on an amendment to the Licensing Agreement.  Many other terms in the Term Sheet went unfulfilled.

**The Releases**

On August 26, 2014, HCM and the Kardashians executed the Releases.  The Kardashians released "any and all Claims" which could have been asserted against HCM and its affiliates "in connection with (a) the Licens[ing] Agreement and the subject matter thereof, (b) Boldface and its business, and/or (c) the [*Tillett* litigation settlement] and the subject matter thereof, including without limiting the generality of the foregoing, any Claims and Obligations which were, might or could have been asserted in connection with [HCM's] involvement or investment in Boldface and its business."  Appellants released their claims against the Kardashians in commensurate fashion.

The Releases stated that any "dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by arbitration"

6

administered by JAMS "pursuant to its Comprehensive Arbitration Rules and Procedures." Subdivision (b) of the JAMS Comprehensive Arbitration Rules & Procedures, Rule 11 provided that "[j]urisdictional and arbitrability disputes, including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought, and who are proper Parties to the Arbitration, shall be submitted to and ruled on by the Arbitrator. The Arbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter."

**The Asset Purchase Agreement; Bill of Sale; Instrument of Transfer and Assignment**

To accomplish the acquisition of Boldface, HCI and/or HCM sued Boldface as a secured creditor. The trial court placed Boldface into receivership. HCI and/or HCM made a credit bid on all of Boldface's assets.

The receiver in possession of Boldface's assets executed an Asset Purchase Agreement (APA) with Newco. The APA was dated October 15, 2014. It stated that the receiver would transfer various assets, including all rights under the Licensing Agreement. Further, it stated that Newco would assume all Boldface's liabilities for transaction taxes, and "all liabilities and obligations arising on or after the Closing Date, relating to or arising out of the Acquired Assets." Under the APA, Newco was not "assuming any other liability or obligation" and specified that "[a]ll such other liabilities and obligations shall be retained by and remain liabilities and obligations of Boldface[.]"

Newco and the receiver executed a bill of sale dated October 22, 2014, as well as an Instrument of Transfer and Assignment.

7

**Haven; Negotiations Between the Kardashians and HCI/HCM**

HCI/HCM formed Haven to hold the former assets of Boldface. Haven took Newco's place and acquired the assets on October 17, 2014. Boldface's CEO, LaBonty, continued on as the CEO of Haven.

LaBonty dedicated much of the next year looking for an investor-partner to replace HCI/HCM and to fund Haven's capital through a relaunch and coordinated his efforts with McAvoy and Kaufman on behalf of HCI/HCM, and Todd Wilson on behalf of the Kardashians.

As 2015 wore on, the parties realized that no investor was prepared to buy out HCI/HCM's interests in the Licensing Agreement. HCI/HCM terminated LaBonty as CEO. On December 5, 2015, McAvoy and Kaufman spoke to the Kardashians' representatives about entering a long-term licensing agreement. The Kardashians were interested, but only if HCI/HCM would commit to investing sufficient capital in Kardashian Beauty to adequately fund development, production, marketing and sales. HCI/HCM submitted a proposal that offered debt financing at levels the Kardashians deemed inadequate.

**Notice of Breach**

By the beginning of 2016, the Kardashians were increasingly disenchanted with the idea of continuing their relationship with Haven and HCI/HCM. They had not received any royalties due from Boldface or Haven except for the advance payment of $1 million.

On February 26, 2016, the Kardashians sent appellants a letter stating that they had breached the Licensing Agreement by

failing to pay $3,043,625 in royalties and failing to indemnify the Kardashians for $767,259.73 in legal fees and costs incurred in the *Tillett* litigation.

**HCI and HCM's Complaint for Breach of Contract and Various Torts**

HCI and HCM sued the Kardashians for breach of the Term Sheet, breach of its covenant of good faith and fair dealing, breach of fiduciary duty, fraud, negligent misrepresentation, and promissory estoppel. They alleged: "The essence of the [Term Sheet] was that [HCI/HCM] would put up millions of dollars to fund the continued distribution of [the Kardashians' makeup] line, and [the Kardashians] would continue to be the faces of the line and actively promote, market and support the line, while making certain concessions under their existing deal with Boldface." The Kardashians' "support was . . . absolutely essential to the success of the Kardashian-branded line[.]" While HCI/HCM "upheld its end of the bargain, [the Kardashians] did not. After the parties executed the [T]erm [S]heet and [HCI/HCM's] money was committed, [the Kardashians] almost immediately stopped marketing, promoting and supporting the line and began courting new potential investors to buy out [HCI/HCM's] stake." The Kardashians' "wrongful conduct . . . destroyed any opportunity for [HCI/HCM] to obtain the benefit of its bargain under the [T]erm [S]heet." As a result, HCI/HCM "suffered significant damages, including the loss of approximately $10,170,000 in invested funds, as well as the loss of the value of [HCI/HCM's] equity interest in the company that distributes the Kardashian Beauty line, valued at between" $64 and $180 million.

**The Kardashians' Demand for Arbitration**

The Kardashians filed a demand for arbitration of claims against appellants for breach of the Licensing Agreement, breach of the Term Sheet, breach of the implied covenant of good faith and fair dealing of both contracts, promissory fraud and declaratory relief. The Kardashians sought damages for appellants' failure to pay about $3.4 million in guaranteed minimum royalties as well as $809,502.32[5] in indemnity related to the legal fees and costs the Kardashians incurred in the *Tillett* litigation. They additionally sought damages for appellants' unauthorized uses of their images. In the prayer, they sought recovery of attorney fees.

**Petition to Compel Arbitration of the Breach of Contract and Tort Claims in HCI and HCM's Complaint**

The Kardashians filed a petition to compel HCI and HCM to arbitrate the breach of contract and tort claims in their complaint, citing the arbitration clauses set forth in the Releases and the Licensing Agreement. The trial court granted the petition. In its written ruling, it stated:[6]

"a) Plaintiffs concede that under the parties' agreements, 'the arbitrator determines the question of arbitrability with respect to the [Releases].

---

[5] The amount of the requested indemnity increased over time. The reasons are not relevant to this opinion.

[6] In the ruling, the trial court referred to "Plaintiffs" and "HILLAIR." While it is clear that "Plaintiffs" refers to HCI and HCM, it is unclear whether "HILLAIR" is a reference to HCI and HCM or perhaps just HCM. We have therefore preserved these references in our quote of the ruling.

"b) Plaintiffs' causes of action raise common questions of law or fact re the issues to be arbitrated under the [Releases]. It is undisputed that, under [the Releases] HILLAIR released the Kardashians from 'any and all claims and obligations,' etc., and that in the instant complaint, Plaintiffs seek to recover monies from the Kardashians that Plaintiffs alleged[ly] 'invested in Boldface and its business . . . .' Such claims, regardless of whether they are asserted as breaches of the 'Term Sheet,' necessarily 'relate to the [Releases] or its breach, termination, enforcement, interpretation or validity thereof' and must therefore be resolved in arbitration per the parties' agreement.

"c) The non-signatories can be compelled to arbitration where, as here, the claims are 'dependent upon or inextricably intertwined with the obligations imposed by the contract containing the arbitration clause.'

"d) The question of arbitrability under the Licens[ing] Agreement should also be decided by the arbitrator. Here, Plaintiffs' objections to arbitration are either already under consideration, or will be referred to the arbitration panel by JAMS.

"e) Plaintiffs are estopped from denying the arbitrability of claims under the Licens[ing] Agreement, having sued pursuant to that agreement. . . .

"f) For purposes of determining arbitrability, HILLAIR is the 'alter ego' of HAVEN—at least, that's a question for the arbitrator to decide."

**Further Notice of Breach**

On June 22, 2016, the Kardashians sent a letter notifying appellants of "certain breaches" and stated that appellants failed to pay required indemnification of $815,747.20 plus 8 percent of

11

royalties on sales.  The purpose of the letter was to give appellants an opportunity to cure these breaches within 10 business days.  It stated that notice of these breaches was not intended to waive any breaches detailed in prior letters or the demand for arbitration.

**The Termination Letter; The Kardashians' Federal Action for Injunctive Relief; The Federal Court's Ruling on Arbitration**

The Kardashians sent a letter on July 8, 2016, terminating the Licensing Agreement.  After Haven continued using the Kardashians' names and images, the Kardashians filed a complaint against appellants, Kaufman, and McAvoy for injunctive relief in federal court under the Lanham Act (15 U.S.C. § 1051 et seq.) and California law to enjoin appellants' alleged infringement of the Kardashians' trademarks and state rights of publicity.  The Kardashians obtained a preliminary injunction to prevent Haven from releasing the Kardashian Beauty products and using the Kardashians' names and images without their permission.[7]

The Kardashians requested that the federal court compel appellants, Kaufman and McAvoy to arbitrate.  The federal court issued an order to show cause but then later denied the request as to HCI, HCM, Kaufman and McAvoy because they were not signatories to the Licensing Agreement, and because equitable estoppel could not be used to compel nonsignatories to arbitrate their defenses to contract claims.  The federal court noted that

---

[7]     Appellants represent that once the preliminary injunction was in force, Haven "immediately ceased distributing products and wound down its business."

12

the Kardashians and Haven agreed that their dispute was subject to arbitration.

**Appellants' Objection to Arbitral Jurisdiction; the Panel's Order Regarding Jurisdiction and Arbitrability**

Appellants objected to the Panel's arbitral jurisdiction under the Releases, contending they have "nothing whatsoever to do with the claims in this action. The Releases are irrelevant as they predate any of the claims at issue." (Bolding omitted.) They also argued: "[T]he claims herein do not arise out of the [Releases], nor are they related in any way to the [Releases]. The [Releases are] utterly irrelevant to this dispute." Alternatively, they argued that to the extent any claims were arbitrable under the Releases, that would mean they had been released and should be dismissed. Appellants also objected to the Panel's arbitral jurisdiction under the Licensing Agreement with respect to the claims asserted by HCI and HCM against the Kardashians. According to appellants, (a) the trial court had to decide whether HCI and HCM, as nonsignatories to the Licensing Agreement, could be compelled to arbitrate based on equitable estoppel or an alter ego theory, and (b) the facts did not support a finding that equitable estoppel or an alter ego theory were applicable.

Aside from a narrow exception, the Panel determined that it had subject matter and personal jurisdiction over all claims, defenses and parties in the arbitration based on the Releases and Licensing Agreement.

**Arbitration Proceedings**

In the arbitration, parties asserted their claims against each other. As for the Kardashians, they sought damages for breach of the Licensing Agreement by HCI, HCM and Haven;

13

intentional interference with contractual relations by HCI and HCM; and infringement by Haven of the Kardashians' trademark and right to publicity.

*Denial of Appellants' Motion for a Continuance*

Appellants filed a motion to continue the arbitration hearing, and the Kardashians opposed. The Panel denied the motion.

*Trial Briefs*

The Kardashians submitted a trial brief and argued that they were entitled to guaranteed minimum royalties or, alternatively, sales royalties. They also claimed they were entitled to be indemnified for the attorney fees they incurred in the *Tillett* litigation. With respect to Haven, the Kardashians sought damages for trademark infringement and violation of their right to publicity. They also sought an award of attorney fees under the Lanham Act in conjunction with their federal action to enjoin Haven from infringing on their trademarks and right of publicity.

In appellants' trial brief, they argued in favor of their affirmative claims. They also argued that the parties intended that the Releases have no effect on the parties' obligations under the Term Sheet.

*The Merits Hearing*

The Panel conducted a nine-day arbitration hearing from February 20, 2018, through March 2, 2018.

*Postarbitration Briefs*

The Kardashians submitted a postarbitration brief in which they requested an award of $6,280,750 in guaranteed minimum royalties. In the alternative, they requested $342,498 in sales royalties that were due. Also, the Kardashians requested

14

an award of $1,027,854 to indemnify them for their defense in the *Tillett* litigation.

Appellants submitted a postarbitration brief and argued that they had been damaged by the Kardashians' conduct in multiple respects, including their failure to promote the Kardashian Beauty cosmetics line. Regarding the Kardashians' claims, appellants argued that they did not breach the Licensing Agreement, Haven did not infringe on any trademarks or publicity rights, and HCI and HCM did not breach the Term Sheet. Appellants did not argue that the Kardashians' claims had been released by the Releases and should be dismissed.

*The Merits Orders*

The Panel issued two merits orders.

In the first merits order, it noted that the Kardashians "seek recovery jointly and severally from Hillair and Haven of $6,280,750 in [guaranteed minimum royalties] . . . accrued but unpaid during the term of the Licens[ing Agreement]. If the Panel finds that [guaranteed minimum royalties] are not available, [the Kardashians] seek recovery from Hillair of $342,498, representing 8% of total net sales of $4,281,234 during relevant Haven Contract Periods. The Kardashians also seek recovery of $1,027,854 in attorney's fees" related to the *Tillett* litigation.

The Panel proceeded to find that Haven breached the Licensing Agreement by (a) failing to make the sales royalty payments to the Kardashians as demanded on July 22, 2016, and (b) failing to indemnify the Kardashians for legal fees that they incurred defending themselves in the *Tillett* litigation. Based on these breaches, the Kardashians' "termination of the Licensing Agreement was warranted[.]" Next, the Panel found that HCI,

15

HCM and "Haven are jointly and severally liable for damages caused by their breaches of the Licensing Agreement. Haven is a wholly-owned subsidiary of [HCI/HCM], and Haven's only function was to serve as the agent of [HCI/HCM]. All dealings between Haven and the Kardashians were conducted by [HCI/HCM] through [McAvoy] or [Kaufman]. To the extent Haven's CEO, LaBonty, interacted with the Kardashians, he was under the direction and control of McAvoy or Kaufman. [¶] The principal members of [HCI/HCM] also were the principal members of Haven and controlled the conduct of LaBonty throughout their mutual relationship with the Kardashians. [HCI/HCM] controlled the most important decisions of Haven in its dealings with the Kardashians under the Licensing Agreement. Under the circumstances, Haven served as the agent of [HCI/HCM]."[8] The Panel also concluded that "it would be inequitable" for HCI/HCM to avoid liability after "ensuring that Haven would have inadequate funds to pay" any judgment against it.

The Panel rejected appellants' argument that "the receivership proceedings extinguished the Kardashians' rights to indemnification under . . . the Licensing Agreement. Here[,] the [r]eceiver took the assets of Boldface subject to all liens, defenses, and equities[.]" Also, the APA, Bill of Sale and Instrument of Transfer and Assignment clearly provided that the assets of Boldface were conveyed as is. "That this also was the understanding of Haven and [HCI/HCM] was confirmed by the

---

[8] To support its agency finding, the Panel cited *Sonora Diamond Corp. v. Superior Court* (2000) 83 Cal.App.4th 523 (*Sonora Diamond*).

testimony of [LaBonty], former CEO of both Boldface and Haven, and Haven's [chief financial officer], Jeanene Morgan [(Morgan)], by email communications between [Kaufman], [LaBonty], [Morgan], and Todd Wilson."

Shifting from liability to damages, the Panel determined that the "Licensing Agreement provides substantial guidance on how these damages should be calculated." "The Panel finds that the most reasonable and readily quantifiable measure of the Kardashians' damages for unpaid royalties is the sum of the guaranteed minimum royalties that were due. Section 5.A. of the Licensing Agreement specifies that the Kardashians are to receive a Guaranteed Minimum Royalty of $4,686,125 for the original 54 months of the Licensing Agreement from May 9, 2012, to November 30, 2016." The Panel explained that Haven gave written notice of extending the term of the Licensing Agreement by an additional 18 months through May 30, 2018. Thus, the Kardashians "contend they are entitled to an additional [guaranteed minimum royalty] of $2,594,625[,] bringing the total [guaranteed minimum royalty] to which they are entitled to $7,280,750, less the $1,000,000 advance payment, for a total [guaranteed minimum royalty] due to the Kardashians of $6,280,750."

Appellants argued that the Kardashians should be equitably estopped from recovering guaranteed minimum royalties "because the Term Sheet provided for their elimination upon execution of an amended Licensing Agreement." Because the Licensing Agreement was never amended, the Panel rejected this argument.

The Panel awarded a total of $1,027,854 for attorney fees incurred in the *Tillett* litigation. Next, it determined that

17

because Haven infringed on the Kardashians' trademark and publicity rights, and because the Kardashians obtained an injunction, the Lanham Act (15 U.S.C. § 1117(a)) entitled the Kardashians to recover their related attorney fees and costs. The order specified that the Kardashians could file a petition for attorney fees and costs. Finally, it determined that the Kardashians were entitled to interest at 18 percent per annum and instructed the parties to confer and agree on a computation of the interest to be included in the award.

All of appellants' claims against the Kardashians were rejected.

In the second merits order, the Panel awarded the Kardashians preaward and postaward interest.

*The Interim Award*

The Panel issued an interim award consistent with the merits orders. It added that the Kardashians were entitled to $254,673 in attorneys' fees and costs, and HCI/HCM were entitled to a $54,986.40 offset based on an award of sanctions against the Kardashians for spoliation of evidence.[9] Per the interim award, the parties were ordered to confer concerning the form and content of the final award, and to serve the Panel with "a joint report with agreed and non-agreed corrections and suggestions for inclusion in a final award, which must be consistent with the determinations set forth in [the] Interim Award[.]"

*Appellants' Letter Brief; Further Briefing*

On December 14, 2018, appellants submitted a letter. They argued that Haven was not the agent of HCI and HCM so they

---

[9]    Appellants claimed that the Kardashians intentionally deleted their e-mails.

18

could not be liable for its breaches, and that the Releases extinguished the Kardashians' claims for guaranteed minimum royalties and indemnity.

The Panel issued an order stating that the parties could submit briefing.

In response, the Kardashians defended the Panel's imposition of agency liability. Regarding the Releases, they posited that appellants' "arguments are too little, too late. First, for strategic reasons, Hillair knowingly waived any argument that the [Releases were an affirmative defense to the Kardashians' claims for] damages. Hillair was obviously concerned that the . . . Release[s] would jeopardize *its* alleged claim for millions of dollars in damages based on its 'lost investments' in Boldface. Having chosen to ignore [whether the Releases were an affirmative defense] to the Kardashians' claims in its over 120 pages of pre-trial and post-trial briefing, [appellants] must live with the consequences of that choice. In any event, even if the Panel chooses to reach the merits of [appellants'] waived Release[s] arguments, the Kardashians in August 2014 could not have, and did not, release Hillair from liability for *future* conduct. Because the Panel's liability and damages award is based on conduct occurring *after* August 2014, the Release[s] ha[ve] no effect whatsoever on the viability of the Kardashians' claims." They cited law for the proposition that the failure to raise an issue prior to a ruling on the merits functions as a waiver.

*Order Re Requested Modifications of Interim Award; The Final Award*

In an order regarding requested modifications of the interim award, the Panel stated, "Certain modifications to which

19

the parties have agreed or to which no objection has been made have been incorporated into the final award, which is rendered contemporaneously with this Order.  To the extent other requested modifications have not been included, the Panel has determined those modifications to be unnecessary and/or inappropriate.  Accordingly, the Panel expressly [denies] any request for modification that has not been incorporated into the Final Award."

The final award was consistent with the interim award except that the indemnity award was increased from $1,027,854 to $1,070,714.

**The Competing Petitions to Confirm and Vacate the Arbitration Award**

The Kardashians petitioned to confirm the arbitration award and appellants petitioned to set it aside.  The trial court confirmed the award, denied the petition to set aside the award, and entered judgment against HCI, HCM and Haven for $11,243,772.03.  Haven was ordered to pay the additional sum of $254,673.

This appeal followed.

## DISCUSSION

Appellants challenge the order compelling arbitration, claiming:

(1) The trial court improperly made substantive determinations regarding arbitrability that were reserved for the Panel in the arbitration clause in the Releases.

(2)  The trial court improperly permitted the Panel to decide whether HCI and HCM, as third parties to the Licensing Agreement, had to arbitrate under that agreement's arbitration clause.

20

(3) Insofar as the trial court stated that HCI and HCM were equitably estopped as third parties from denying arbitrability under the Licensing Agreement, that statement was nonbinding dicta.

(4) If the trial court made a binding ruling based on equitable estoppel that HCI and HCM, as third parties, must arbitrate based on the arbitration clause in the Licensing Agreement, it erred.

(5) Even if the trial court properly compelled HCI and HCM to arbitrate their contract claims under the Licensing Agreement based on equitable estoppel, it erred when it compelled them to arbitrate their tort claims based on that same doctrine.

Next, appellants contend that the trial court abdicated its role and failed to address many of the urged grounds for vacatur of the arbitration award. Appellants challenge the orders confirming the arbitration award and denying vacatur of the arbitration award as follows:

(1) "The Panel failed to decide a necessary issue: whether the Releases, pursuant to which the Panel took jurisdiction over HCI and HCM, released any of the claims at issue."

(2) "The arbitrators 'exceeded their powers' by. . .[:]"

(a) "awarding $6,280,750 as a 'proxy' remedy for Haven's failure to pay a fixed and undisputed amount of $342,498 due under the License;"

(b) "awarding [guaranteed minimum royalties] and indemnity amounts that [r]espondents repeatedly relinquished;"

(c) "imposing joint and several liability on HCI and HCM for Haven's breaches of a contract to which they were not parties;"

21

(d) "improperly awarding attorneys' fees under the Lanham Act;" and

(e) deciding issues beyond the scope of their jurisdiction.

(3) "Appellants were substantially prejudiced by the arbitrators' denial of Appellants' well-founded request for a first continuance of the final hearing."

## I. Standards of Review.

Orders compelling arbitration are subject to independent review on appeal when the trial court's interpretation of the arbitration agreement does not involve conflicting extrinsic evidence. (*Cortez v. Doty Bros. Equipment Co.* (2017) 15 Cal.App.5th 1, 12.) The same standard applies to orders confirming arbitration awards and denying their vacatur. (*Lindenstadt v. Staff Builders, Inc.* (1997) 55 Cal.App.4th 882, 892, fn. 7.; *SWAB Financial, LLC v. E\*Trade Securities, LLC* (2007) 150 Cal.App.4th 1181, 1198 (*SWAB*).)

## II. Up Front Resolution of Certain Issues.

Though appellants raise many arguments attacking the underlying court orders, the lead dominoes in this appeal are: (1) whether the final award is subject to judicial review for errors of fact or law, (2) whether the Panel determined its own jurisdiction under the arbitration clause in the Releases, (3) whether the Panel's determination of its own jurisdiction under the Releases is subject to judicial review, (4) whether the Panel's determination of its own jurisdiction under the Releases was wholly groundless, and (5) whether the Kardashian's claims against appellants should have been dismissed because those claims were released.

22

The first issue impacts whether we can question the Panel's legal and factual findings.

The second, third and fourth issues streamline matters because if the Panel had jurisdiction over all the claims based on the Releases, it does not matter whether they had jurisdiction based on the Licensing Agreement.

Finally, the second through fifth issues are pivotal because the Kardashian's claims were arbitrable, if at all, only under the Releases. If they were not arbitrable, then the portion of the final award awarding damages to the Kardashians should have been vacated. While equitable estoppel was a viable theory for compelling appellants to arbitrate their claims under the Licensing Agreement, equitable estoppel was not available as a vehicle for compelling appellants to arbitrate their defenses to the Kardashians' claims because appellants were not signatories to the Licensing Agreements and the doctrine cannot be invoked against nonsignatory defendants. (*Jensen v. U-Haul Co. of California* (2017) 18 Cal.App.5th 295, 306–307 [*plaintiffs* can be equitably estoppel from denying arbitrability when they seek the benefits of contracts containing an arbitration clause]; *JSM Tuscany, LLC v. Superior Court* (2011) 193 Cal.App.4th 1222, 1239–1240 [same].)

A. *In General, We Cannot Review Errors of Fact or Law*.

Unless an arbitration clause specifically requires arbitrators to act in conformity with rules of law, an arbitrator can base his or her decision upon broad principles of justice and equity. Arbitrators may expressly or impliedly reject a claim that a party might successfully have asserted in a judicial action. (*Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 10–11 (*Moncharsh*).) Generally, arbitration awards are immune from

judicial review. "More specifically, courts will not review the validity of the arbitrator's reasoning. [Citations.] Further, a court may not review the sufficiency of the evidence supporting an arbitrator's award. [Citations.]" (*Id.* at p. 11.) With narrow exceptions, "an arbitrator's decision cannot be reviewed for errors of fact or law." (*Ibid*.)

Despite *Moncharsh*, appellants contend that when the Federal Arbitration Act (FAA) applies, an arbitrator's errors of law are subject to judicial review.

The FAA applies to written agreements to arbitrate if they evidence "a transaction involving commerce." (9 U.S.C. § 2) The Licensing Agreement and Term Sheet fall within that definition because they contemplated the sale of cosmetics, an endeavor that affects commerce. (*Shepard v. Edward Mackay Enterprises, Inc.* (2007) 148 Cal.App.4th 1092, 1097 ["'"involving commerce"'" means "'"affecting commerce,"'" "a term of art that ordinarily signals the broadest permissible exercise of Congress's commerce clause power"].) But the "FAA's procedural provisions are not controlling, and the determinative question is whether [the California Arbitration Act (CAA)] procedures conflict with the FAA policy favoring the enforcement of arbitration agreements. [Citation.]" (*Cable Connection, Inc. v. DIRECTV, Inc.* (2008) 44 Cal.4th 1334, 1352 (*Cable Connection*).)

Based on *Cable Connection*, appellants argue that we should find that the CAA is preempted to "the extent that it affords more restricted review than the FAA." There are some federal courts that will find that an arbitrator exceeded his or her powers when the arbitration award evinces a manifest disregard of the law. (*Comedy Club, Inc. v. Improv West Assocs.* (9th Cir. 2009) 553 F.3d 1277, 1290; *Comerica Bank v. Howsam* (2012) 208

24

Cal.App.4th 790, 830 [noting that federal courts are split as to whether manifest disregard of the law remains grounds for vacatur].) Appellants request that we apply that standard. But precedent establishes that an "arbitrator's [alleged] manifest disregard of the law is not a ground for vacatur under California law." (*Ibid*.) *Cable Connection* does not countermand this rule. When California courts refrain from reviewing arbitration awards for errors of law, that logically leads to confirmation of those awards out of deference. A rule that leads to confirmation of arbitration awards helps to enforce arbitration agreements. There is no basis to find preemption.

We conclude that our review of the arbitration award is broadly controlled by *Moncharsh*.

B. *The Panel Decided its Own Jurisdiction Under the Arbitration Clause in the Releases.*

Some arbitration clauses grant arbitrators the unusual power of deciding their own jurisdiction. (*Patchett v. Bergamot Station, Ltd.* (2006) 143 Cal.App.4th 1390, 1397 [arbitrator could decide his own jurisdiction when the parties agreed that controversies of whatever nature in relation to the interpretation of the agreement, including the arbitrability of any claim, would be settled by arbitration].)

The arbitration clause in the Releases state that all controversies arising out of or relating to the agreement, including interpretation and determination of the scope or applicability of the arbitration clause shall be determined by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures. Those rules gave the arbitrator final say on jurisdiction and arbitrability. In their reply brief, appellants state that they "do not dispute that the Panel had the power to

determine whether the claims at issue were arbitrable pursuant to the Releases[.]"

We conclude that the Releases gave the Panel the power to decide its own jurisdiction. The question presented is whether it in fact decided its own jurisdiction. While appellants agree that the Panel had the power to do so, they contend that the trial court, not the Panel, decided arbitral jurisdiction. Because a trial court cannot make determinations on substantive issues of arbitrability that are reserved for arbitrators (*Sandquist v. Lebo Automotive, Inc.* (2016) 1 Cal.5th 233, 261), appellants argue that we must reverse the final award.

To tackle these issues, we must interpret (1) the trial court's order compelling arbitration of HCI and HCM's claims and (2) the Panel's order on jurisdiction over HCI and HCM's claims and the Kardashians' claims.

1. The Trial Court's Order Refrained from Deciding Substantive Issues of Arbitrability Regarding HCI and HCM's Claims and Instead Referred Those Issues to the Eventual Arbitrators.

"The meaning of a court order or judgment is a question of law within the ambit of the appellate court. [Citation.] '. . . In construing orders they must always be considered in their entirety, and the same rules of interpretation will apply in ascertaining the meaning of a court's order as in ascertaining the meaning of any other writing. If the language of the order be in any degree uncertain, then reference may be had to the circumstances surrounding, and the court's intention in the making of the same.' [Citations.]" (*In re Ins. Installment Fees Cases* (2012) 211 Cal.App.4th 1395, 1429–1430.)

The trial court determined that HCI and HCM's claims based on the Term Sheet necessarily related to the breach, termination, enforcement, interpretation or validity of the Releases and, on that basis, it referred them to arbitration because HCI and HCM sought to recover money that they invested in Boldface and its business. At the same time, it stated that the parties "concede that under the parties' agreements, 'the arbitrator determines the question of arbitrability with respect'" to the Releases, and the "question of arbitrability under the Licens[ing] Agreement should also be decided by the arbitrato[rs][.]" In context, we interpret the trial court's order to mean that the parties had to litigate all issues—including the scope of arbitration—before the eventual arbitrators. The trial court left it for the Panel to decide what issues fell within its arbitral jurisdiction.

2. <u>The Panel Decided its Own Jurisdiction.</u>

The Panel's jurisdictional order stated: "The Panel has determined that it has subject matter and personal jurisdiction over all claims, defenses and parties in and to this arbitration—including all state court claims asserted by the Hillair parties, which have been determined to be arbitrable, based on [the Releases] and the Licens[ing] Agreement—except for the narrow exception carved out by [the federal court] . . . ." The Panel then added that it "decided to accord respect and thus defer to . . . [the trial court's] determinations of equitable estoppel as a basis for [its] order . . . compelling arbitration of Hillair's state court claims."

In a footnote, the Panel stated that it determined that appellants' "contentions and argument that its claims were neither released nor releasable under the [Releases] is an

27

invitation to put the 'cart-before-the-horse,' which the Panel has declined to do, instead determining that—regardless of their ultimate resolution by the Panel—the claims are subject to the arbitration provision of the [Releases]."

Whether it was right or wrong, the Panel determined that it had jurisdiction over all claims except those it expressly excluded.

Pushing back, appellants take the position that the jurisdictional order was preliminary, and that the Panel failed to make a final decision on jurisdiction by deciding whether the Releases in fact released the claims at issue. There was nothing preliminary about the language in the jurisdictional order. Even if it was preliminary, the final award implicitly resolved all jurisdictional issues. After all, by ruling on the various claims, the Panel was expressing its belief that it had the authority to issue those rulings.[10]

C. *The Panel's Determination of Its Own Jurisdiction Must be Upheld Unless it Was Wholly Groundless.*

*Greenspan v. LADT, LLC* (2010) 185 Cal.App.4th 1413, 1439 (*Greenspan*) held that a court can review "whether the arbitrator's decision on arbitrability was 'wholly groundless.' [Citations.]" (*Id*. at p. 1443.)

*Greenspan* relied on a federal case and two state cases holding that a trial court should honor a party's claim that a dispute is arbitrable unless that claim is wholly groundless.

[10] Appellants contend that the final award was not final because the Panel did not decide the necessary issue of whether any claims were released. They seek to conflate that issue with whether the Panel determined that it had jurisdiction under the Releases. We view these as separate issues. Whether the Final Award was final is analyzed in part IV.A. *post*, of the Discussion.

28

(*Greenspan, supra,* 185 Cal.App.4th at p. 1443.) That federal case, *Qualcomm, Inc. v. Nokia Corp.* (Fed.Cir. 2006) 466 F.3d 1366, was overruled by *Henry Schein, Inc. v. Archer & White Sales, Inc.* (2019) 139 S.Ct. 524, 531 (*Schein*), which held that there is no "'wholly groundless'" exception to the power of an arbitrator to decide his or her own jurisdiction. The Supreme Court explained that when "the parties' contract delegates the arbitrability question to an arbitrator, the courts must respect the parties' decision as embodied in the contract." (*Schein, supra,* at p. 531.) Because California courts often look to federal law with respect to arbitration matters, the Kardashians suggest that *Greenspan* may no longer be good law in light of *Schein*. But *Greenspan* sets forth state law, and it has not been overruled. We opt to follow it.

D. *Appellants Failed to Show That the Panel's Exercise of Jurisdiction Was Wholly Groundless.*

Appellants did not raise the "wholly groundless" issue in their opening brief. The Kardashians, however, raised it in their respondents' brief, and argued it. In the reply brief, appellants argue: "So while [the Kardashians] are correct that a challenge to an arbitrator's jurisdictional ruling is ordinarily governed by a 'wholly groundless' standard, the Panel never made this crucial jurisdictional ruling as to the 'scope or applicability' of the Releases to the claims. There was thus no jurisdictional ruling on this issue for the Court to evaluate under a 'wholly groundless' standard." Alternatively, they argue: "Even applying the 'wholly groundless' standard that [the Kardashians] advocate, the Panel's decision to rule on the *merits* of claims that it treated as unreleased and, thus, untouched by the Releases—and which therefore bore no conceivable relation to the Releases [citation]—

29

was the very definition of 'wholly groundless.'" This one sentence argument in the reply brief assumes that there is no conceivable relation between any of the claims and Releases but offers no analysis. Elsewhere in appellants' briefs, and in connection with their discussion of whether the Panel failed to decide a necessary issue, they posit that if the Panel found a relationship between the Releases and the Kardashians' claims, that finding "would produce an absurd result because then every conceivable unreleased claim would be 'related' to the Releases[.]"

The subject matter of the Releases was claims that could have been asserted in connection with the Licensing Agreement, Boldface and its business, the *Tillett* litigation, and HCM's involvement with or investment in Boldface and its business. The parties were required to arbitrate any dispute related to the Releases. The word "related" is a broad concept meaning associated or connected. All the claims arose out of the Licensing Agreement, the *Tillett* litigation, and HCM's involvement with or investment in Boldface and its business. Even if those claims postdated the Releases, they involved the same or similar subjects, parties and legal issues, and it was not wholly groundless for the Panel to conclude that their subject matter was related to the Releases. This analysis is circumspect and thereby avoids the result of every conceivable unreleased claim being related to the Releases.

E. *Whether the Kardashians' Claims Should Have Been Dismissed is Not Reviewable.*

Appellants posit that the Kardashians' claims accrued before the Releases were executed and should have been dismissed by the Panel accordingly. But appellants are

30

essentially arguing that the Panel made either an error of fact or an error of law. Neither are reviewable.

## III. Challenges to the Order Compelling HCI and HCM to Arbitrate the Contract and Tort Claims in Their Complaint.

A trial court cannot make determinations on substantive issues of arbitrability that are reserved for arbitrators. (*Sandquist v. Lebo Auto., Inc.* (2016) 1 Cal.5th 233, 261.) Appellants contend that the trial court violated this rule when it compelled arbitration under the Releases. But as we explained in part II.B.1., *ante*, of the Discussion, the trial court did not decide any substantive issues of arbitrability, which undermines appellants' position. It referred substantive issues of arbitrability to the arbitrators.

Next, appellants lodge a series of objections to the trial court's order compelling them to arbitrate under the Licensing Agreement based on an equitable estoppel theory. Those issues are moot given that appellants were required to arbitrate under the Releases.

## IV. Challenges to the Orders Confirming the Arbitration Award and Denying Vacatur.

A. *First Argument* (*The Panel Failed to Decide a Necessary Issue: Whether the Releases, Pursuant to Which the Panel Took Jurisdiction Over HCI and HCM, Released Any of the Claims at Issue*).

Appellants argue that the final award did not determine the necessary issue of whether any claims were extinguished by the Releases. This leads them to claim that the arbitration award was not subject to confirmation because it was not final. This argument fails.

31

Code of Civil Procedure section 1283.4[11] provides: "[An arbitration] award shall be in writing and signed by the arbitrators concurring therein. It shall include a determination of all the questions submitted to the arbitrators the decision of which is necessary in order to determine the controversy." If an arbitration award does not meet these requirements, it is not a final award and cannot be confirmed. (*Kaiser Foundation Health Plan, Inc. v. Superior Court* (2017) 13 Cal.App.5th 1125, 1131 (*Kaiser*).)

It is for the arbitrators to decide what is necessary to the ultimate decision. (*Cothron v. Interinsurance Exchange* (1980) 103 Cal.App.3d 853.) "An award is valid if its settles the entire controversy and there is no general rule that an arbitrator must either find facts [citation], detail the process by which the result was reached [citations], or give the reasons behind the award. [Citation.] It is not the finding on issues that is required; it is the determination thereof when 'necessary in order to determine the controversy.'" (*Id*. at p. 860.) Thus, an award "need not . . . set forth findings of facts or a statement of reasons. The award is valid as long as it serves to settle the entire controversy and simply state that one party pay the other a sum of money. [Citation.]" (*Severtson v. Williams Construction Co.* (1985) 173 Cal.App.3d 86, 92.)

The final award determined whether the parties proved their claims and stated the sums that appellants were required to pay the Kardashians for damages, interest and attorney fees. That was sufficient to make it valid. The law did not require the arbitration award to include a determination on whether any

---

11      All further references are to the Code of Civil Procedure unless otherwise indicated.

claims had been released or, alternatively, whether appellants waived their affirmative defense based on the releases due to their failure to sufficiently assert the issue until after the Panel issued its interim award.

Appellants argue that reversal is dictated by *Banks v. Milwaukee Ins. Co.* (1966) 247 Cal.App.2d 34 (*Banks*). In that case, the plaintiff received an award of special damages in arbitration but not an award of general damages. He petitioned the trial court to correct or vacate the award. In a declaration submitted to the trial court, the arbitrator declared that through inadvertence, mistake and/or excusable neglect, he failed to make an award for general damages. (*Id*. at pp. 35–37.) The defendant sought confirmation of the award. After a hearing, the trial court denied the plaintiff's petition and confirmed the award. On appeal, the court noted, "If the record actually shows that the issue of general damages had been submitted to the arbitrator, and that he had totally failed to consider it, the [trial] court could and should have vacated the award." (*Id*. at p. 38.) Because the record showed that the arbitrator failed to consider the element of general damages, the court concluded the arbitrator violated section 1283.4. (*Banks, supra,* at p. 39.) *Banks* is distinguishable. In that case, the arbitrator failed to rule on an issue of damages. That did not happen here.

*Kaiser, supra,* 13 Cal.App.5th 1125 also offers appellants no aid. There, an arbitration panel issued a partial final award regarding certain claims but not others. (*Id*. at p. 1130.) The court concluded that the partial final award was not final under section 1283.4 and could not be confirmed. (*Kaiser*, *supra*, at p. 1131.) Unlike in *Kaiser*, the arbitration award here resolved all the parties' claims.

33

B. *Second Argument* (*The Panel Exceeded Its Powers*).

    1. <u>Relevant Law</u>.

Section 1286.2, subdivision (a)(4) establishes that an arbitration award can be vacated if a court determines that the arbitrators exceeded their powers.  An arbitrator "'exceeds his powers . . . when he acts without subject matter jurisdiction, decides an issue that was not submitted to arbitration [citations], arbitrarily remakes the contract [citation], upholds an illegal contract [citation], issues an award that violates a well-defined public policy [citation], issues an award that violates a statutory right [citation], fashions a remedy that is not rationally related to the contract [citation], or selects a remedy not authorized by law [citations].'"  (*O'Flaherty v. Belgum* (2004) 115 Cal.App.4th 1044, 1055–1056.)  If an arbitration clause defines the issues to be arbitrated and describes the limits of the arbitrators' review authority and the available remedies, arbitrators exceed their authority if they stray beyond those limits.  (*Cal. Faculty Ass'n. v. Superior Court* (1998) 63 Cal.App.4th 935, 953 (*California Faculty*).)

In *AMD*, our Supreme Court sought "a meaningful, workable and properly deferential framework for reviewing an arbitrator's choice of remedies" for breach of contract.  (*AMD*, *supra*, 9 Cal.4th at pp. 366, 381.)  It held:  "[I]n the absence of more specific restrictions in the arbitration agreement, the submission or the rules of arbitration, the remedy an arbitrator fashions does not exceed his or her powers if it bears a rational relationship to the underlying contract as interpreted, expressly or impliedly, by the arbitrator and to the breach of contract found, expressly or impliedly, by the arbitrator."  (*Id*. at p. 367.)  *AMD* explained that "[a]rbitrators are not obliged to read

34

contracts literally, and an award may not be vacated merely because the court is unable to find the relief granted was authorized by a specific term of the contract. [Citation.]" (*AMD*, *supra*, 9 Cal.4th at p. 381.) An award "will be upheld so long as it was even arguably based on the contract; it may be vacated only if the reviewing court is *compelled* to infer the award was based on an extrinsic source. [Citations.]" (*Ibid.*)

2. Second Argument, Part (a) (The Panel Exceeded its Powers by Awarding *$6,280,750* as a Proxy Remedy for Haven's Failure to Pay a Fixed and Undisputed Amount of *$342,498* Due Under the Licensing Agreement).

In a civil court, an award cannot be based on an estimate when the contract provides a readily ascertainable basis for calculating damages. (*El Centro Mall, LLC v. Payless ShoeSource, Inc.* (2009) 174 Cal.App.4th 58, 64.) Based on appellants' reading of the final award, the Panel violated this rule by using guaranteed minimum royalties as an estimate (or a proxy) for sales royalties due under the Licensing Agreement even though it provided a readily ascertainable basis for calculating sales royalties. Thus, they claim that the Panel exceeded its powers when it awarded $6,280,750 in guaranteed minimum royalties instead of the readily ascertainable amount of $342,498 in sales royalties. This leads them to also claim that the award was not rationally related to the Licensing Agreement and a breach. (*AMD*, *supra*, 9 Cal.4th at p. 378.) But the Panel expressly stated that the Licensing Agreement entitled the Kardashians to either sales royalties or guaranteed minimum royalties, and it stated that guaranteed minimum royalties "were due." It implicitly found that the Licensing Agreement required those payments and that appellants were in breach of that term.

Thus, the award was not based on an estimate of sales royalties due, it was based on the guaranteed minimum royalties that were due. Consequently, it was rationally related to the Licensing Agreement and a breach, and it passes the low hurdle necessary to escape court oversight.

Shifting to a different argument, appellants suggest that the Panel exceeded its authority by awarding guaranteed minimum royalties because the Kardashians' June 22, 2016, letter demanded payment of only the sales royalties. This argument is infirm. First, as stated above, the test is whether the award bears a rational relationship to the Licensing Agreement and a breach. Second, the June 22, 2016, letter made clear that the Kardashians were not waiving the demands for guaranteed minimum royalties set forth in the February 26, 2016, letter and the demand for arbitration. More importantly, we cannot second guess the Panel's determination of the issues to be decided in arbitration.

        3. <u>Second Argument, Part (b) (The Panel Exceeded its Powers by Awarding Guaranteed Minimum Royalties and Indemnity Amounts That the Kardashians Repeatedly Relinquished)</u>.

Appellants assert that the Releases relinquished the Kardashians' claims related to the Licensing Agreement, the Term Sheet called for the parties to amend the Licensing Agreement to eliminate guaranteed minimum royalties, and the APA stated that Boldface retained liabilities predating the APA. Based on these contracts, appellants argue that they had defenses to the Kardashians' claims for guaranteed minimum royalties and indemnity under the Licensing Agreement. They bundle all this together and argue that the awards of guaranteed

36

minimum royalties and indemnity did not bear a rational relationship to the Release, Term Sheet and APA and therefore the Panel exceeded its authority.

Appellants' argument finds no support in the law. *AMD* only requires us to consider if an award is rationally related to the underlying contract. It does not require us to consider whether the awards were rationally related to contracts providing affirmative defenses. The cases cited by appellants do not establish otherwise. (See *California Faculty, supra,* 63 Cal.App.4th at p. 953 [holding that the arbitrator failed to conform to the specific restrictions of the parties' agreement and therefore made decisions outside the scope of his authority]; *Blue Cross of California v. Jones* (1993) 19 Cal.App.4th 220, 228 [holding that an award that exceeded financial limits imposed in insurance policies exceeded the arbitrators' authority]; *Bonshire v. Thompson* (1997) 52 Cal.App.4th 803, 811 [an award exceeded the arbitrator's authority because it was based on a contractual term provided by extrinsic evidence that the arbitration clause prohibited the arbitrator from considering].)

4. Second Argument, Part (c) (The Panel Exceeded its Powers by Imposing Joint and Several Liability on HCI and HCM for Haven's Breaches of a Contract to Which they were not Parties).

The Panel held HCI and HCM liable for Haven's breaches based on an agency theory. Alternatively, it found that it would be inequitable to permit HCI and HCM to avoid liability after

37

ensuring Haven was insolvent. This alternative ruling suggested an alter ego theory of liability.[12]

Appellants argue that the "agency remedy" bears no rational relationship to the Licensing Agreement and Haven's breaches.[13] They cite no law establishing that the *AMD* rational relationship test applies to an arbitrator's decision to impose agency liability on a principal. We conclude that the imposition of agency liability is not reviewable under *AMD*. Whether a

---

[12] The Panel did not expressly hold HCI and HCM liable on an alter ego theory. But it did rule that it would be inequitable to allow them to escape liability after ensuring that Haven did not have adequate funds to pay a judgment, and it cited *Toho-Towa Co., Ltd. v. Morgan Creek Productions, Inc.* (2013) 217 Cal.App.4th 1096, 1108, a case that cited and then applied the alter ego doctrine. Under the alter ego doctrine, the corporate veil can be pierced when (1) there is a unity of interest between the corporation and the owners such that they are not separate, and (2) there would be an inequitable result if the acts in question are treated as those of the corporation alone. (*Curci Investments, LLC v. Baldwin* (2017) 14 Cal.App.5th 214, 221 (*Curci*).) "Evidence of inadequate capitalization is . . . merely a factor to be considered by the trial court in deciding whether or not to pierce the corporate veil." (*Associated Vendors, Inc. v. Oakland Meat Co.* (1962) 210 Cal.App.2d 825, 841–842.)

[13] Appellants cite *Postal Instant Press, Inc. v. Kaswa Corp.* (2008) 162 Cal.App.4th 1510, 1522 for the proposition that agency is a court-created remedy. But that case stated that "[t]raditional piercing of the corporate veil is justified as an equitable remedy when the shareholders have abused the corporate form to evade individual liability, circumvent a statute, or accomplish a wrongful purpose. [Citations.]" Whether agency is a "remedy" does not impact our analysis.

principal should be held liable for an agent's breach of contract is wholly separate from whether the contract damages award is rationally related to the agent's breach.  As an aside, we wish to point out that the "agency doctrine may bind a parent to the contracts of its subsidiary where, in addition to owning the subsidiary, the parent company exercises 'sufficient control over the [subsidiary's] activities' such that the subsidiary becomes a 'mere agen[t] or "instrumentality" of the parent.'  [Citations.]" (*Cohen v. TNP 2008 Participating Notes Program, LLC* (2019) 31 Cal.App.5th 840, 862.)  The Panel found that HCI and HCM owned and controlled Haven, and that Haven's only role was to serve as their agent.  These are findings of fact that we cannot second guess.

Appellants offer other arguments, each of which fails.  We discuss them in the order they are offered.

a.  Argument that the Award Conflated HCI and HCM and Evinced No Rational Basis for Piercing the Veil as to Each Separately.

Appellants state that the Kardashians "did not argue, adduce evidence, or even take discovery attempting to prove that HCI or HCM was the alter ego or agent of the other;" the Kardashians and the Panel improperly lumped HCI and HCM together and treated them as one entity; the Kardashians had the burden to prove some basis for piercing the veil as to HCI and HCM separately; and they submitted no evidence and made no attempt to prove any alter ego relationship between any of the appellants at the final hearing.

These statements boil down to two ideas.  Imposing liability on HCI and HCM was contrary to the law, and it was contrary to the evidence.  But the Panel was permitted to base its decision on

39

broad principles of justice and equity, and we cannot review the Panel's reasoning or the sufficiency of the evidence.

b.  Argument that Controlling Parent-Subsidiary Agency Law Precludes a Joint and Several Remedy Under These Circumstances.

Appellants maintain that *Sonora Diamond*—the case cited by the Panel in support of its decision to impose liability on HCI and HCM based on agency—establishes that there was insufficient evidence that Haven was the agent of either HCI or HCM.  But as we already stated, we cannot review the agency finding, which ends our analysis.

c.  Argument that Vacatur is Also Warranted Under Statutory Right and Public Policy Exceptions.

Appellants contend that the Panel's decision violated statutory rights and well-defined public policies related to shielding shareholders from liability.  (*Sargon Enterprises, Inc. v. Browne George Ross LLP* (2017) 15 Cal.App.5th 749, 765–769 [arbitrator misinterpreted an arbitration agreement and violated a party's absolute statutory right to initiate litigation in court by finding that when the party sued in court, it breached the arbitration agreement]; Corp. Code, §§ 200 [separate existence of corporations], 409 [limited shareholder liability], 17701.04 [limited liability for the debts and other obligations of limited liability companies].)  This argument is moot because the Panel expressly premised HCI's and HCM's liability on agency, and that ruling is not impacted by appellants' argument.  But even if we entertained the notion that the Panel ruled exclusively based on an alter ego theory, HCI and HCM's challenge would fail as a matter of law.  Unlike in *Sargon*, this case does not involve the undisputed violation of an absolute statutory right.  As noted in

40

*Curci*, a company's corporate veil can be pierced under certain circumstances. Thus, the only way that HCI's and HCM's statutory rights could have been conceivably violated by the Panel is if there was insufficient evidence to support an alter ego theory. That issue was beyond the purview of the trial court, and it is beyond ours, so there would be no basis to conclude that the Panel exceeded its authority.

   5. <u>Second Argument, Part (d) (The Panel Exceeded its Powers by Improperly Awarding Attorney Fees under the Lanham Act)</u>.

  The Lanham Act provides that when "a violation of any right of the registrant of a mark registered in the Patent and Trademark Office . . . shall have been established in any civil action arising under this Act, the plaintiff shall be entitled . . . to recover . . . the costs of the action. . . . The court in exceptional cases may award reasonable attorney fees to the prevailing party." (15 USC § 1117(a).)

  The Panel awarded attorney fees after concluding that title 15 United States Code section 1117(a) was triggered because the Kardashians obtained an injunction to prevent Haven from infringing on their trademark and publicity rights.

  Appellants contend that the attorney fee award based on the trademark infringement claim cannot stand because it bears no rational relationship to the Licensing Agreement or the breach of it, and because this was not an exceptional case. These arguments miss the mark. Trademark infringement sounds in tort (*Mission Imports, Inc. v. Superior Court* (1982) 31 Cal.3d 921, 931) and the attorney fee award was based on the Lanham Act. *AMD* does not apply because it imposes a limitation on remedies for breach of contract. As for whether this is an

exceptional case, that issue relates to the sufficiency of the evidence. *Moncharsh* prohibits us from examining the evidence to determine its sufficiency.

*Taylor v. Van-Catlin Construction* (2005) 130 Cal.App.4th 1061 bolsters our conclusion. The arbitrator in that case awarded attorney fees to the prevailing party based on a Civil Code section. On appeal, the losing party objected, arguing that the arbitrator exceeded his powers. The court rejected the argument, holding that even if the arbitrator failed to apply the law properly, "it would have amounted to an error of law, not an act exceeding his powers. The award therefore was not subject to judicial review[.]" (*Id.* at pp. 1067–1068.)

6. <u>Second Argument, Part (e) (The Panel Decided Issues Beyond the Scope of its Jurisdiction)</u>.

Appellants argue that the Panel lacked arbitral jurisdiction over all the claims. Presumably, they mean that it lacked subject matter jurisdiction. "[T]he subject matter jurisdiction *of an arbitrator* is purely a product of contract [citation], which by definition turns on the parties' mutual *consent* [citation]." (*Douglass v. Serenivision, Inc.* (2018) 20 Cal.App.5th 376, 385.) The question, then, is whether the claims presented by the parties were subject to being arbitrated.

Because the Panel's exercise of jurisdiction under the arbitration clause in the Releases was not wholly groundless, we are required to defer to the Panel's determination of its own jurisdiction. It determined that it had jurisdiction over all the claims that it decided.

42

C.  *Third Argument (Appellants were Substantially Prejudiced by the Arbitrators' Denial of Appellants' Well-Founded Request for a First Continuance of the Final Hearing).*

"The neutral arbitrator may adjourn the hearing from time to time as necessary.  On request of a party to the arbitration for good cause, or upon his own determination, the neutral arbitrator may postpone the hearing to a time not later than the date fixed by the agreement for making the award[.]"  (§ 1282.2, subd. (b).)

An arbitration award can be vacated if "the rights of the party were substantially prejudiced by the refusal of the arbitrators to postpone the hearing upon sufficient cause being shown[.]"  (§ 1286.2, subd. (a)(5).)  When arbitrators exercise their discretion to deny a continuance, a court must consider whether the arbitrators abused their discretion in determining whether there was sufficient cause, and whether the moving party suffered substantial prejudice.  (*SWAB, supra,* 150 Cal.App.4th at p. 1198.)  As noted before, our review of the denial of a petition to vacate is de novo.  "However, we apply the substantial evidence test to the trial court's ruling to the extent it rests upon a determination of disputed factual issues. [Citations.]"  (*Id.* at p. 1196.)

An abuse of discretion occurs when a decisionmaker exceeds the bounds of reason, all of the circumstances before it being considered.  The burden is on the party complaining to establish an abuse of discretion.  (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 566.)

43

l.  Relevant Facts.[14]

Appellants moved to continue the February 20, 2018, final arbitration hearing on multiple grounds.

The Panel denied the motion.  It's ruling detailed the following:  The Panel entered an order on March 3, 2017, establishing certain discovery deadlines and setting a hearing on the merits to take place during a two-week period starting February 19, 2018.  On November 8, 2017, appellants filed a motion for a continuance of the discovery deadlines and the merits hearings, claiming:  the Kardashians failed to produce substantial quantities of documents; discovery from third parties had not been obtained; there had been massive spoliation of the Kardashians' e-mails; designation of experts and expert witness discovery had not been undertaken; attorney-client issues raised by the Kardashians' business manager/attorney had to be resolved; an attorney recently left the firm representing appellants; and appellants' lead counsel had a conflict due to a trial scheduled in January 2018.  The Kardashians objected to a continuance but agreed to adjust the discovery schedule.

Per the ruling, the Panel indicated that it had considered whether a continuance would prejudice the Kardashians, and it noted that the arbitration would be pending for almost two years when the merits hearing commenced.  It then stated:  "The core issues of the parties' claims, which are now presented in or related to this arbitration, have been in federal and state courts even longer.  While the Panel does not doubt that the state court's [decision to set a] . . . trial for mid-January 2018

---

[14]    In their opening brief, appellants do not offer a summary of their motion or the Kardashians' opposition.  We decline to summarize them on our own.

44

. . . caused [appellants'] counsel consternation, both sides' lack of preparation for the close-in-time scheduled Merits Hearing in this arbitration—despite the . . . repeated[] strong encouragement  to both sides to get moving—was of their own making."

Moving on, the Panel explained that it "approved a revised discovery schedule, including the scheduling of party witnesses throughout the month of December, and [it] established other discovery deadlines relating to expert discovery."  Starting in November 2018, the chair of the Panel made himself available to conduct weekly discovery hearings, and he agreed to attend depositions, including one that would raise attorney-client privilege issues.

Finally, the Panel determined that a continuance was not necessary.  It noted that the Kardashians claimed that they had produced all requested documents, and they had no documents relating to dealings with third parties.  And it added:  "When pressed during the November 30 hearing regarding what expert discovery is needed . . . , [appellants acknowledged] it would likely be limited to a single damages expert.  [The Kardashians] stated they would call no experts, except a rebuttal damages expert, if deemed necessary.  The spoliation issue relating to the alleged deletion of emails by the Kardashians[] can be addressed at their depositions scheduled in the next two weeks and can be addressed by the Panel during the Merits Hearing, according to proof.  Similarly, as noted above, the attorney-client privilege issue relating to the Kardashians' business manager/attorney . . . also can be readily addressed by the Chair during [the applicable] deposition."

## 2. Third Argument, Part (a) (The Panel Abused its Discretion).

In the opening brief, appellants do not expressly argue that the Panel abused its discretion, but they imply as much when they state, "[T]here is no dispute that [appellants'] briefing and sworn declarations established 'sufficient cause' supporting their request for a brief first continuance of the final hearing."  They do not explain why they believe that the issue is undisputed.  They merely cite to the trial court's order denying the petition to vacate the arbitration award.  Then, in the reply brief, appellants state, "Neither [the Kardashians], nor the Panel, contest[ed] that [appellants] [had] made the necessary showing on the first prong."

This assertion does not hold up.

At no point did the trial court's order state that there was sufficient cause for a continuance.  Rather, it explained the trial court's reasoning as follows:  "[Appellants] do not, in their motion, argue that they were not ready to proceed with the Final Merits Hearing.  They do not make a claim, nor demonstrate a factual basis to argue, that their counsel, because the . . . [P]anel did not grant their motion for a hearing continuance, was unable to effectively present their claims and defenses at the Final Merits Hearing.  [¶]  [Appellants] make several arguments that are unrelated to the . . . [P]anel's denial of their motion to continue the Final Merits Hearing.  They advise they were blindsided when, after the . . . [P]anel had approved discovery subpoenas to be served on third-parties, the Ninth Circuit ruled (in an unrelated case) that . . . the FAA did not authorize pre-trial discovery against non-parties. . . .  [Appellants], therefore, were not able to enforce their discovery subpoenas against third

46

parties (the parties' arbitration agreement adopted the FAA), but they could [have], of course, serve[d] hearing subpoenas on those parties.  Any ruling that the . . . [P]anel made with respect to [appellants'] discovery subpoenas against third parties complied with the law and is not a ground to vacate the arbitration award.  [¶]  [Appellants] also complain because some of the Kardashian defendants had deleted their emails for the relevant of time period.  [Appellants] refer to this conduct as spoliation of evidence.  The [P]anel did address this issue in its decision. . . .  Any remedy for the conduct that [appellants] complain of was within [the] province of the [P]anel.  [¶]  The Court finds no basis to vacate the arbitration award under the arguments advanced by" appellants.  (Bolding omitted.)

The Panel determined that a continuance was not necessary, and in their brief, the Kardashians state in a heading, "The Panel Did Not Abuse Its Discretion in Denying the Motion for a Continuance."  (Bolding omitted.)

Appellants' argument is deficient.  We conclude that they failed to demonstrate that it was undisputed that the Panel abused its discretion or that the Panel exceeded the bounds of reason.  "It is not our responsibility to develop an appellant's argument.  [Citation.]" (*Alvarez v. Jacmar Pacific Pizza Corp.* (2002) 100 Cal.App.4th 1190, 1206, fn. 11.)

### 3. Third Argument, Part (b) (Appellants Were Substantially Prejudiced).

Because appellants failed to demonstrate an abuse of discretion, the issue of substantial prejudice does not have to be reached.  Nonetheless, we have examined their prejudice argument and deem it lacking.

Appellants argue that they are prejudiced in three ways.

47

First, they contend they were deprived of the opportunity to discover and present third-party documents and testimony to which the Panel had already ruled they were entitled. They contend that this discovery was "important." Their argument devolves into a discussion suggesting that even though third-party discovery subpoenas are not authorized under the FAA, the Panel could have concluded that the CAA governed. This leads appellants to state that they "were thus forced to forego this important evidence and testimony in its entirety in order to avoid the specter of taking live testimony and/or getting a document dump from hostile parties in the midst of the final hearing without knowing what the testimony or evidence would be." Because they do not explain why the discovery was important, we cannot analyze why they would be prejudiced if they did not obtain it.

Second, appellants contend they were forced to conduct the hearing with virtually none of the Kardashians' relevant e-mails because they were destroyed. Appellants do not explain the relevance of these e-mails, nor do they explain why a continuance would have changed the situation if the e-mails had been destroyed. We are left grasping at straws to understand why appellants suffered prejudice.

Third, appellants argue that "when the Panel refused to continue the merits hearing, it simultaneously forced [them] to take virtually the entirety of discovery after the long-established discovery cutoff, during precisely the period in which [their] lead counsel had repeatedly informed the Panel . . . [he] would be unavailable to take discovery due to a conflict with another scheduled trial. [Citation.] As a result, [they] were forced to hire new co-counsel with no prior background on the case, and were

48

deprived of their counsel of choice during this crucial period of discovery and trial preparation." The problem for appellants is that they make no attempt to quantify the impact of not having their chosen counsel during discovery and trial preparation. Rather, they simply cite a Florida case for the proposition that an arbitrator's refusal to postpone a hearing after withdrawal of counsel lacked a reasonable basis. Here, appellants' counsel did not withdraw.

Simply put, appellants have not established prejudice.[15]

All other issues are moot.

## DISPOSITION

The judgment is affirmed. The Kardashians shall recover their costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.

_____, J.
ASHMANN-GERST

We concur:

_____, P. J.
LUI

_____, J.
CHAVEZ

---

[15]   To the degree appellants raise new arguments in their reply brief to establish they were substantially prejudiced by not being granted a continuance, we deem those arguments waived. (*Wurzl v. Holloway* (1996) 46 Cal.App.4th 1740, 1755, fn. 1 ["'a point not presented in a party's opening brief is deemed to have been abandoned or waived'"].)